## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY

<table>
<tr>
<td>

WILLIAM BOWEN, AMY BRASHER, JESSE ROGERS, JOHN CHAMPION, JESSE GILSTRAP, and MARY BLEIER-TROUP, individually and on behalf of all others similarly situated,

*Plaintiffs*,

v.

PAXTON MEDIA GROUP, LLC,

*Defendant.*

</td>
<td>

Case No. 5:21-cv-00143-GNS

**JURY TRIAL DEMANDED**

</td>
</tr>
</table>

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs William Bowen, Amy Brasher, Jesse Rogers, John Champion, Jesse Gilstrap, and Mary Bleier-Troup (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, upon personal knowledge of facts pertaining to themselves and on information and belief as to all other matters, by and through their undersigned counsel, hereby file this First Amended Class Action Complaint against Defendant Paxton Media Group, LLC ("Defendant," "Paxton," or the "Company").

### I.    NATURE OF THE ACTION

1.      Unauthorized third parties infiltrated and accessed the Company's inadequately protected computer systems between February 26, 2021, and March 20, 2021. During that time, the unauthorized third parties obtained the protected personal information of Paxton's current and former employees by accessing Paxton's computer systems and copying their personally identifiable information ("PII"). The exfiltration of personal information was due to the

inadequate computer security by Paxton. Paxton disclosed that the PII that was taken by the unauthorized third parties included employees' names, dates of birth, Social Security numbers, driver's license numbers or state ID numbers, financial account and/or bank routing numbers, personal health insurance information, taxpayer identification numbers, and credit card numbers and/or expiration dates (the "Data Breach"). [1]

2.      On information and belief, the unauthorized third parties stole the PII of at least 20,835 current and former employees of Paxton.

3.      According to Paxton's notice to state attorneys general advising of the Data Breach, Paxton reportedly identified suspicious activity on its computer systems as early as March 20, 2021 but did not advise affected individuals of the breach until more than three (3) months later, and in some cases four (4) months later.

4.      On or about June 24, 2021, Paxton began mailing breach notifications to affected current and former employees.  According to the notice letter Paxton sent to affected individuals, Paxton identified suspicious activity on its computer systems in March and opened an investigation.  Paxton's investigation determined the Company suffered a "cyberattack" that allowed "an unauthorized actor" to copy information from Paxton's computer system between February 26 and March 20, 2021.  Paxton's investigation found that personal information on its current and former employees was in the compromised systems, and that while specific details vary for the affected individuals, "the scope of the information potentially includes individuals' name, date of birth, Social Security number, driver license number or state ID number, financial

---

[1] *Paxton Newspaper Employees' Data Copied, Company Reveals*,
https://www.arkansasbusiness.com/article/136757/paxton-newspaper-employees-data-copied-company-reveals (last accessed September 10, 2021).

account and/or routing number, health insurance information, taxpayer identification numbers, and credit card numbers and/or expiration dates."[2]

5.      On information and belief, Plaintiffs' and Class members' PII was stolen in the serious and intentional cyberattack.  Plaintiffs' and Class members' PII will now be used for criminal purposes, such as fraudulent text messaging schemes, email scams, identity theft and fraudulent purchases – including phishing, which is a criminal attack performed by cybercriminals to obtain sensitive information such as online passwords, by impersonating a reliable entity in a digital text or email communication – and sold by the bad-actors responsible for the Data Breach to other criminals on the dark web.

6.      Paxton's conduct – failing to take adequate and reasonable measures to ensure that its current and former employee data was protected, failing to take available steps to prevent and stop the Data Breach, failing to take adequate measures to detect the Data Breach, failing to provide timely notice of the Data Breach to its employees and former employees, and enabling the bad-actors to execute the Data Breach and steal Plaintiffs' and Class members' PII – has caused substantial harm and injuries to Plaintiffs and Class members.

7.      Paxton's material failures put Plaintiffs' and Class members' PII and interests at serious, immediate, and ongoing risk and, additionally, caused additional costs and expenses to Plaintiffs and Class members associated with time and money spent as a result of taking time and incurring costs to address and attempt to ameliorate, mitigate, protect themselves and deal with the actual and future consequences of the Data Breach.

8.      As a result of the Data Breach, Plaintiffs and Class members have already suffered damages. For example, now that their PII has been released into the criminal cyber domains,

---

[2] *Id.*

Plaintiffs and Class members are at imminent and impending risk of identity theft. This risk will continue for the rest of their lives, as Plaintiffs and Class members are now forced to deal with the danger of identity thieves possessing and using their PII. Additionally, Plaintiffs and Class members have already lost time and money responding to and mitigating the impact of the Data Breach, which efforts are continuous and ongoing.

9.      Plaintiffs bring this action individually and on behalf of the proposed Class and seek actual damages, statutory damages, punitive damages, and restitution, with attorney fees, costs, and expenses, and further sue Defendant for, among other causes of action, negligence, breach of implied contract, invasion of privacy, breach of confidence and unjust enrichment. Plaintiffs also seek declaratory and injunctive relief, including significant improvements to Paxton's data security systems and protocols, future annual audits, Defendant-funded long-term credit monitoring services, and other remedies as the Court deems necessary and proper.

## II.      JURISDICTION AND VENUE

10.      This Court has diversity jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this is a class action involving more than 100 class members, the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and many members of the class are citizens of states different from Defendant.

11.      The Court has personal jurisdiction over Paxton because Defendant is headquartered in this District and Defendant conducts substantial business in Kentucky and this District through its headquarters, offices, parents, and affiliates.

12.      Venue is proper in the Western District of Kentucky District under 28 U.S.C. § 1391(b)(1) because Defendant maintains its principal place of business in this District and therefore resides in this District pursuant to 28 U.S.C. § 1391(c)(2). A substantial part of the

events and omissions giving rise to this cause of action occurred in McCracken County, Kentucky. Therefore, venue is properly placed in the Paducah Division of the United States District Court for the Western District of Kentucky.

### III.    PARTIES

#### Plaintiffs

13.    Plaintiff Bowen is a citizen of Virginia Beach the Commonwealth of Virginia. Virginia Beach is a city and is not part of any county in Virginia. He received notice from Paxton on or about July 28, 2021, informing him of the Data Breach.

14.    Plaintiff Brasher is a citizen of Greene County in the State of Arkansas. She received notice from Paxton on or about June 24, 2021, informing her of the Data Breach.

15.    Plaintiff Rogers is a citizen of Livingston County in the Commonwealth of Kentucky. He received notice from Paxton on or about June 24, 2021, informing him of the Data Breach.

16.    Plaintiff Champion is a citizen of McCracken County in the Commonwealth of Kentucky. He received notice from Paxton in or around late June or early July, 2021, informing him of the Data Breach.

17.    Plaintiff Gilstrap is a citizen of McCracken County in the Commonwealth of Kentucky. He received notice from Paxton in or after June 2021, informing him of the Data Breach.

18.    Plaintiff Bleier-Troup is a citizen of Riverside, California. She received notice from Paxton in or around June 2021 informing her of the Data Breach.

19.     Plaintiffs bring this action on behalf of all persons whose PII was compromised as a result of Paxton's failure to: (i) adequately protect the PII of Plaintiffs and Class members; (ii) timely warn Plaintiffs and Class members of Defendant's inadequate information security practices or that the Data Breach had taken place; and (iii) effectively secure hardware containing protected PII using reasonable and effective security procedures free of vulnerabilities and incidents.  Defendant's conduct amounts to negligence and violates state and federal laws.

20.     Plaintiffs and Class members have suffered injury as a result of Paxton's conduct. These injuries include: (i) lost or diminished value of PII; (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; and (iv) the continued and certainly increased risk to their PII, which may remain backed up in Paxton's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

21.     Paxton obtained and continues to maintain Plaintiffs' PII and has a legal duty and obligation to protect that PII from unauthorized access and disclosure.  Plaintiffs would not have entrusted their PII to Defendant had they known that Paxton would fail to maintain adequate data security.  Plaintiffs' PII was compromised and disclosed as a result of the Data Breach.

22.     Had Defendant advised Plaintiffs that Defendant continued to store Plaintiffs' PII with inadequate security for years after Class members' employment had terminated, Plaintiffs could have taken actions to protect their PII.

23.     As a result of the Data Breach, Plaintiffs have already spent, and anticipate spending, considerable time on an ongoing basis to try to mitigate and address harms caused by

the Data Breach.  As a result of the Data Breach, Plaintiffs will continue to be at increased risk of identity theft and fraud for years to come.

24.    Like Plaintiffs, the other Class members have a continuing interest in ensuring that their PII is protected and safeguarded from future breaches.

25.    The injuries suffered by Plaintiffs and Class members as a direct result of the Data Breach include one or more of the following:

A.  unauthorized use of their PII;

B.  theft of their PII;

C.  costs associated with the detection and prevention of identity theft and unauthorized use of their PII;

D.  damages arising from the inability to use their PII;

E.  time spent and costs associated with the loss of productivity or the enjoyment of one's life from taking time to address and attempt to ameliorate, mitigate and deal with the actual and future consequences of the Data Breach, including researching the potential impact of the Data Breach, evaluating and enrolling in credit monitoring, purchasing identity protection, reviewing bank account statements, credit card statements, credit reports, and online accounts, evaluating implementation of a credit freeze, and the stress, nuisance and annoyance of dealing with all issues resulting from the Data Breach;

F.  damages arising from the theft of their PII, including addressing identity theft and fraudulent accounts and loans;

G.  damages to and diminution in value of their PII entrusted to Paxton by virtue of their employment by Defendant;

> H.  the loss of Plaintiffs' and Class members' privacy; and
>
> I.   ascertainable losses in the form of deprivation of the value of their PII for which there is a well-established and quantifiable national and international market.

**Defendant**

26.     Defendant Paxton is a corporation formed under the laws of the Commonwealth of Kentucky with its principal place of business at 201 South 4th Street, Paducah, McCracken County, Kentucky, 42003.  Paxton's agent for service of process is James Paxton, 201 South 4th St, Paducah, Kentucky, 42003. Paxton operates as a publishing business and owns approximately thirty (30) daily newspapers in the Midwest and South United States, including its flagship The Paducah Sun (Kentucky) and The Herald-Sun (Durham, North Carolina).[3]  Paxton also owns several dozen weekly papers and more than 100 free papers, as well as a television station in Paducah, Kentucky.[4]  The Company owns over 100 publications across 14 states.[5]

27.     Paxton makes sizeable profits at the expense of its employees; however, Paxton betrayed the trust of its current and former employees by putting their PII at risk of attack by cybercriminals. Paxton's actions and/or inaction exposed its employees' PII, including highly sensitive PII, to cyberattack.  Through this lawsuit, the numerous affected current and former employees who entrusted their PII to Paxton have a voice in Plaintiffs.

## IV.     STATEMENT OF FACTS

---

[3] *See* https://www.dnb.com/business-directory/company-profiles.paxton_media_group_llc.c03374c5f73cc13ba562f66dcd5cc806.html (last accessed September 10, 2021).

[4] *Id.*

[5] *Paxton Newspaper Employees' Data Copied, Company Reveals*, https://www.arkansasbusiness.com/article/136757/paxton-newspaper-employees-data-copied-company-reveals (last accessed September 10, 2021).

**The Data Breach**

28.     Between February 26, 2021, and March 20, 2021, Paxton's computer systems were subject to a cyberattack through which unauthorized third-party cybercriminals gained access to Plaintiffs' and Class members' PII, including highly sensitive Social Security numbers, financial account and routing numbers, and credit card numbers, among others.

29.     Paxton discovered the Data Breach on March 20, 2021, but did not begin notifying affected individuals until, at the earliest June 24, 2021, several months after learning of the Data Breach.

30.     Upon information and belief, Paxton has not formally notified many of its current employees of the Data Breach and/or offered a material number of current employees any of the following that is "purportedly" being offered to the Company's former employees as per the Data Breach notification letter, including notice on how the Data Breach affected current employees, guidance to impacted current employees on how to protect against identity theft and fraud, and for current employees whose Social Security number is affected, with complementary access to twelve (12) months of complementary credit monitoring,[6] as well as how to place a fraud alert and security freeze on one's credit file, the contact details for the national consumer reporting agencies, information on how to obtain a free credit report, a reminder to remain vigilant for incidents of fraud and identity theft by reviewing account statements and monitoring free credit reports, and encouragement to contact the Federal Trade Commission, their state Attorney General, and law enforcement to report attempted or actual identity theft and fraud.

---

[6] Paxton's offer of complementary credit monitoring underscores its knowledge of the severity of the Data Breach.

31.     On or about June 24, 2021 – three (3) months after first learning of the Data Breach – Paxton began sending Notices of Data Privacy Event to its current and former employees whose information was accessed in the Data Breach.

32.     It is apparent from the various notices and sample notices of the Data Breach sent to Plaintiffs, the Class, and state Attorneys General that the PII contained within Paxton's computer systems was not adequately secured and protected.

33.     Following discovery of the Data Breach, Paxton began to investigate and address the Data Breach.  Based upon the investigation, the attackers were able to access certain computer systems containing the PII at issue.

34.     Upon information and belief, the unauthorized third-party cybercriminals gained access to the PII with the intent of engaging in misuse of the PII, including marketing and selling Plaintiffs' and Class members' PII on the dark web.

35.     Despite the severity of the Data Breach, Paxton has still not adequately protected Plaintiffs and the Class.  For example, upon information and belief, in the Data Breach Notice, Paxton only provided twelve (12) months of identity theft and credit monitoring protection and only for those individuals whose Social Security numbers were exposed. As noted *supra*, upon information and belief only former employees have been offered the twelve (12) months of identity theft protection.  Although current employees were subject to the same data breach, at the same time and by the same third parties, Paxton has not properly offered its current employees twelve (12) months of identity theft protection, which is inadequate under these circumstances.

36.     In effect, Paxton is shirking its responsibility for the harm and increased risk of harm it has caused Plaintiffs and members of the Class, including the distress and financial burdens the Data Breach has placed upon the shoulders of the Data Breach victims.

37.    To make matters worse, Paxton's attackers gained access to, and possession of, Plaintiffs' and Class members' PII. While many data breach events merely involve the attacker gaining access to the computer or network without meaningful access to the victims' information, in this particular attack on Paxton's systems, hackers gained access to *and copied* Plaintiffs' and Class members' highly sensitive PII, including Social Security numbers and bank account and other financial information.

38.    Indeed, Plaintiffs' and Class members' PII is now in the hands of ill-intentioned criminals. Here, the Data Breach targeted personal information. Thus, a reasonable inference can be drawn that the cyberattackers will use Plaintiffs' and Class members' data for fraudulent purposes.

39.    Paxton failed to adequately safeguard Plaintiffs' and Class members' PII, allowing cybercriminals to access this wealth of priceless information for several months before warning the criminals' victims to be on the lookout, and now offer them almost no remedy or relief.

40.    Paxton failed to spend sufficient resources on cybersecurity training and adequate data security measures and protocols.

41.    Plaintiffs and Class members were required to provide their PII to Paxton as a condition of their employment and with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

42.    The stolen PII at issue has great value to the cyberattackers, due to the large number of individuals affected and the fact that financial and bank account information, dates of birth and Social Security numbers were part of the data that was compromised.  Indeed, the PII

obtained in the Data Breach is not easily changeable or replaceable, such as Social Security numbers and personal health history and insurance information

**Plaintiff Bowen's Experience**

43.     Plaintiff Bowen worked for Paxton in Arkansas from 2006 to 2007 as a copy and page editor and then as a beat writer.

44.     As a condition of his employment, Plaintiff Bowen provided his personal identifying information to Defendant Paxton, including his name, contact information, and Social Security number, among other information.

45.     Although Paxton discovered the Data Breach on March 20, 2021, Plaintiff Bowen was not notified of the Data Breach until sometime after July 28, 2021.

46.     According to the Notice of Data Incident dated July 28, 2021 (the "Data Breach Notice"), sent by Defendant Paxton to Plaintiff Bowen, Plaintiff Bowen's personal information, which included his Social Security number and name, were exposed in the Data Breach, and Defendant Paxton learned of same on March 20, 2021.

47.     After receiving the Data Breach Notice, Bowen spent more than thirty (30) hours dealing with the consequences of the Data Breach and continues to spend many hours dealing with the Data Breach, including reviewing and monitoring his bank accounts, credit card accounts, credit reports and other online accounts, researching the potential impact of the Data Breach, evaluating freezing his credit with credit reporting agencies and credit protection services, enrolling in credit monitoring services, and purchasing additional identity protection through Identity Guard at a cost of $330 per year, all as a result of the Data Breach. Because his PII was exposed in the Data Breach, Plaintiff Bowen purchased identity protection as a direct and

proximate result of the Data Breach.  Plaintiff Bowen is currently in the process of gathering the information necessary to implement a freeze on his credit.

48.     Plaintiff Bowen's increased concerns are further enhanced by recent "phishing" correspondence that he received after receiving the Data Breach Notice, including an apparently fraudulent text message purporting to be from Citibank warning that his Citibank credit card account was past due and providing a link through which to make payment.

49.     Plaintiff Bowen has suffered out-of-pocket expenses, lost time, annoyance, mental distress, interference, and inconvenience as a result of the Data Breach and has increased concerns for the loss of his privacy, which he would not have suffered had Defendant implemented the necessary and proper safeguards to protect its current and former employees' PII from theft.

50.     Plaintiff Bowen has suffered and will continue to suffer from emotional distress related to his fear of identity theft.

51.     Plaintiff Bowen has a continuing interest in ensuring that his PII, which, upon information and belief, remains in Paxton's possession, is protected and safeguarded from future breaches.

**Plaintiff Brasher's Experience**

52.     Plaintiff Brasher worked for Paxton in Arkansas from 2006 to 2007 as a graphic designer.

53.     As a condition of her employment, Plaintiff Brasher provided her personal identifying information to Paxton.

54.     Although Defendant Paxton discovered the Data Breach on March 20, 2021, Brasher was not notified of the Data Breach until on or after June 24, 2021.

55.     According to the Data Breach Notice, dated June 24, 2021, sent by Paxton to Plaintiff Brasher, Defendant determined on May 25, 2021 that Brasher's personal information, including her name, date of birth, Social Security number, and driver license number / state ID number, were exposed in the Data Breach.

56.     After receiving the Data Breach Notice, Plaintiff Brasher has spent more than twenty-five (25) hours, and regularly continues to spend many hours, dealing with the consequences of the Data Breach, including reviewing and monitoring her bank accounts and credit card accounts, evaluating freezing her credit with credit reporting agencies and credit protection services, evaluating enrolling in credit monitoring, and otherwise dealing with the consequences of the Data Breach, including a fraudulent bank account and a fraudulent Small Business Administration ("SBA") loan opened in her name by criminals utilizing her personal information after the Data Breach.

57.     Shortly after receiving the Notice of Data Incident, Plaintiff Brasher received notification through a credit monitoring service of an inquiry from the SBA.  She contacted the SBA, which confirmed a loan had been taken out in her name using her Social Security number, address, and birthdate.  This loan was fraudulent.  It was obtained without Plaintiff Brasher's knowledge or consent.  Similarly, Plaintiff Brasher also received two account statements from BMO Harris Bank N.A. documenting a checking account opened in her name.  This checking account was fraudulent.  It was opened without Plaintiff Brasher's knowledge or consent.  Plaintiff Brasher continues to spend time and effort dealing with the SBA and her bank with respect to these fraudulent occurrences.

58.     Plaintiff Brasher has suffered identify theft, lost time, annoyance, interference, mental distress, and inconvenience as a result of the Data Breach and has increased concerns for

the loss of her privacy, which she would not have suffered had Defendant implemented the necessary and proper safeguards to protect its current and former employees' PII from theft.

59.     Plaintiff Brasher has suffered and will continue to suffer from emotional distress related to her fear of identity theft.

60.     Brasher has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

**Plaintiff Rogers' Experience**

61.     Plaintiff Rogers worked for Paxton in Kentucky from 1979 to 2021. His job title when he left Paxton in 2021 was Production Manager.

62.     As a condition of his employment, Rogers provided his personal identifying information to Paxton.

63.     Although Paxton discovered the Data Breach on March 20, 2021, Rogers was not notified of the Data Breach until on or after June 24, 2021.

64.     According to the Data Breach Notice sent to Rogers, Plaintiff Rogers' personal information, which included his date of birth, Social Security number, and name, were exposed in the Data Breach, and Defendant Paxton learned of same on May 25, 2021.

65.     After the Data Breach, Plaintiff Rogers has spent more than twenty-five (25) hours, and regularly continues to spend many hours, dealing with the consequences of the Data Breach, including reviewing and monitoring his bank accounts and credit card accounts, evaluating freezing his credit with credit reporting agencies and credit protection services, evaluating enrolling in credit monitoring, and otherwise dealing with the consequences of the Data

Breach, including having to deal with the alarming number of targeted spam and phishing emails and text messages that he began receiving on a regular basis since the Data Breach.

66.     Plaintiff Rogers enrolled in the credit monitoring provided by Paxton but found it grossly inadequate.   Rogers thereafter upgraded his account to receive somewhat enhanced identity theft protection from the same service but pays $9.99 monthly in order to receive the somewhat adequate protection.  Plaintiff Rogers also froze his credit and continues to take other steps to remain vigilant for incidents of fraud and identity theft.

67.     Plaintiff Rogers has suffered lost time, annoyance, interference, mental distress, and inconvenience as a result of the Data Breach and increased concerns for the loss of his privacy, which he would not have suffered had Defendant properly implemented the necessary and proper safeguards to protect its current and former employees' PII from theft.

68.     Plaintiff Rogers has suffered and will continue to suffer from emotional distress related to his fear of identity theft.

69.     Rogers has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

**Plaintiff Champion's Experience**

70.     Plaintiff Champion worked for Paxton in Kentucky from 2001to 2018.

71.     As a condition of his employment, Champion provided his personal identifying information to Paxton.

72.     Although Paxton discovered the Data Breach on March 20, 2021, Champion was not notified of the Data Breach until late June or early July 2021.

73.     According to the Data Breach Notice sent to Champion, Plaintiff Champion's personal information, including his date of birth, Social Security Number, and name, were exposed in the Data Breach, and Defendant Paxton learned of same on or about March 20, 2021.

74.     After the Data Breach, Plaintiff Champion has spent time dealing with the consequences of the Data Breach, including reviewing and monitoring his bank accounts and credit card accounts, evaluating freezing his credit with credit reporting agencies and credit protection services, evaluating and enrolling in the credit monitoring provided by Paxton, and otherwise dealing with the consequences of the Data Breach.

75.     Shortly after the Data Breach, Plaintiff Champion, a citizen of Kentucky, received a letter from the Ohio Department of Job and Family Services indicating that according to its records, he had applied for and/or received Pandemic Unemployment Assistance (PUA) benefits during the course of the pandemic.  Plaintiff Champion had done no such action. He contacted the Ohio Department of Job and Family Services, which confirmed that a third party had used his Social Security number to apply for unemployment benefits in the summer of 2021. Plaintiff Champion's Social Security number was used without his knowledge or consent. As a direct and proximate result of the Data Breach, Plaintiff Champion's credit score has been negatively affected.

76.     Plaintiff Champion has suffered identify theft, lost time, annoyance, mental distress, interference, and inconvenience as a result of the Data Breach and has increased concerns for the loss of his privacy, which he would not have suffered had Defendant implemented the necessary and proper safeguards to protect its current and former employees' PII from theft.

77.     Plaintiff Champion has suffered and will continue to suffer from emotional distress related to his fear of identity theft.

78.     Plaintiff Champion has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

**Plaintiff Gilstrap's Experience**

79.     Plaintiff Gilstrap worked for Paxton in Kentucky from 2006 to 2020 in various roles, including studio operator, tape operator, commercial producer, and for most of his employment, newscast director.

80.     As a condition of his employment, Plaintiff Gilstrap provided his personal identifying information to Paxton.

81.     Although Defendant Paxton discovered the Data Breach on March 20, 2021, Gilstrap was not notified of the Data Breach until in or after June 2021.

82.     Upon information and belief, Plaintiff Gilstrap's personal information including his name and Social Security Number, were exposed in the Data Breach.

83.     After the Data Breach, Plaintiff Gilstrap has spent more than twenty (20) hours, and regularly continues to spend many hours, dealing with the consequences of the Data Breach, including reviewing and monitoring his bank accounts and credit card accounts, evaluating freezing his credit with credit reporting agencies and credit protection services, evaluating and enrolling in the credit monitoring provided by Paxton, and otherwise dealing with the consequences of the Data Breach, including a fraudulent bank account opened in his name by criminals utilizing his personal information after the Data Breach.

84.     Shortly after the Data Breach, Plaintiff Gilstrap received a letter from Wells Fargo indicating that an account in his name was being closed due to fraudulent activity by a third party, even though Plaintiff Gilstrap does not have any bank accounts at Wells Fargo.  He contacted

Wells Fargo, which confirmed that a third party had fraudulently opened an account online in his name using his address and Social Security number. This account was fraudulent and Plaintiff Gilstrap was a victim of identity theft. Plaintiff Gilstrap has already lost at least five (5) hours of work time making calls to Wells Fargo to deal with the account that was opened in his name. The account was obtained without Plaintiff Gilstrap's knowledge or consent. Plaintiff Gilstrap continues to spend time and effort dealing with the fraudulent Wells Fargo account.

85.    Plaintiff Gilstrap has suffered identify theft, lost time, annoyance, interference, mental distress, lost wages, and inconvenience as a result of the Data Breach and has increased concerns for the loss of his privacy, which he would not have suffered had Defendant implemented the necessary and proper safeguards to protect its current and former employees' PII from theft.

86.    Plaintiff Gilstrap has suffered and will continue to suffer from emotional distress related to his fear of identity theft.

87.    Gilstrap has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

**Plaintiff Bleier-Troup's Experience**

88.    Plaintiff Bleier-Troup worked for Paxton from 2005 to 2007 as a news anchor/reporter.

89.    As a condition of her employment, Plaintiff Bleier-Troup provided her personal identifying information to Defendant Paxton, including her name, contact information, date of birth, and Social Security number, among other information.

90.    Although Paxton discovered the Data Breach on March 20, 2021, Plaintiff Bleier-Troup was not notified of the Data Breach until in or after June 2021.

91.     According to the Notice of Data Incident sent by Defendant Paxton to Plaintiff Bleier-Troup, Plaintiff Bleier-Troup's personal information, which included her date of birth, Social Security number and name, were exposed in the Data Breach, and Defendant Paxton learned of same on June 28, 2021.

92.     After receiving the Data Breach Notice, Plaintiff Bleier-Troup spent more than five (5) hours dealing with the consequences of the Data Breach and continues to spend many hours dealing with the Data Breach, including reviewing and monitoring her bank accounts, credit card accounts, credit reports and other online accounts, researching the potential impact of the Data Breach, freezing her credit with credit reporting agencies and credit protection services, including Experian, purchasing credit monitoring services through NortonLifeLock at a cost of $17.99 per month, all as a result of the Data Breach.  Because her PII was exposed in the Data Breach, Plaintiff Bleier-Troup purchased credit monitoring protection as a direct and proximate result of the Data Breach.  Plaintiff Bleier-Troup also implemented a freeze on her credit through Experian.

93.     Plaintiff Bleier-Troup has suffered out-of-pocket expenses, lost time, annoyance, mental distress, interference, and inconvenience as a result of the Data Breach and has increased concerns for the loss of her privacy, which she would not have suffered had Defendant implemented the necessary and proper safeguards to protect its current and former employees' PII from theft.

94.     Plaintiff Bleier-Troup has suffered and will continue to suffer from emotional distress related to her fear of identity theft.

95.     Plaintiff Bleier-Troup has a continuing interest in ensuring that her PII, which, upon information and belief, remains in Paxton's possession, is protected and safeguarded from future breaches.

**Paxton's Data Security Safeguards Were Inadequate**

96.     Defendant Paxton has admitted to being a victim of a cyberattack (defined as a "malicious and deliberate attempt by an individual or organization to breach the information system of another individual or organization" typically through malware, ransomware and other hacks[7]).  *See* Notice of Data Privacy Event, attached as **Exhibit 1.**

97.     At all times relevant to this action, Defendant Paxton failed to adequately collect, maintain, and safeguard the PII of its current and former employees, which employee data is highly sensitive personal data such as Social Security numbers and dates of birth.  Paxton's inadequate employee PII security failed to 1) prevent the Data Breach; 2) detect the Data Breach; and 3) prevent the exfiltration of employee data resulting from the Data Breach.

**Prevention**

98.     With respect to prevention, Paxton should have kept this highly sensitive current and former Paxton employee PII on machines/technology with corporate accessibility that was adequately limited.  Similarly, Paxton should have placed this highly sensitive information behind an appropriate firewall, in a "militarized" zone.  The highly sensitive current and former data accessed in the Data Breach also should not have been accessible from wireless devices or remotely accessible virtual private networks and should have been protected with adequate physical security.  Paxton's former employees' information, in particular, should have been stored in a secure location without external access.

---

[7] *See* https://www.cisco.com/c/en/us/products/security/common-cyberattacks.html#~how-cyber-attacks-work (last accessed January 8, 2022).

99.     In addition, Defendant Paxton should have maintained adequate authentication protocols to prevent data access from stolen credentials, such as strong passwords and passwords that are not re-used, and to provide adequate training on phishing (a cybercrime in which a target or targets are contacted by email, telephone or text message by someone posing as a legitimate institution to lure individuals into providing sensitive data[8]) and smishing (a phishing cybersecurity attack carried out over mobile text messaging, also known as SMS phishing[9]), two-factor authentication (a security process in which users provide two different authentication factors to verify themselves[10]), coarse-grained controls (the ability to grant or deny access to resources based on a single factor, *i.e.* role, or entitlement[11]), and fine-grained controls (a method of controlling who can access certain data that uses more nuanced and variable methods for allowing access where each item of data is given its own specified policy for access.[12] "For example, one individual may be given access to edit and make changes to a piece of data, while another might be given access only to read the data without making any changes." *Id.*).

100.     Passwords, salted password hashes (where a password has been turned into a scrambled representation of itself[13]), and the data itself should have been properly stored in

---

[8] *See* https://www.phishing.org/what-is-phishing (last accessed January 8, 2022).
[9] *See* https://www.kaspersky.com/resource-center/threats/what-is-smishing-and-how-to-defend-against-it (last accessed January 8, 2022). *See also*, https://www.trendmicro.com/vinfo/us/security/definition/smishing (last accessed January 8, 2022); https://us.norton.com/internetsecurity-emerging-threats-what-is-smishing.html (last accessed January 8, 2022).
[10] *See* https://www.techtarget.com/searchsecurity/definition/two-factor-authentication (last accessed January 8, 2022).
[11] *See* https://www.axiomatics.com/fine-grained-access-control/ (last accessed January 8, 2022).
[12] *See* https://www.immuta.com/articles/what-is-fine-grained-access-control-and-why-its-so-important/ (last accessed January 8, 2022).
[13] *See* https://www.theguardian.com/technology/2016/dec/15/passwords-hacking-hashing-salting-sha-2 (last accessed January 8, 2022).

encrypted form. Encrypted passwords, password hashes, and data should not have been accessible to any systems other than Paxton's authentication servers.

101.    In addition to password security, Defendant Paxton should have properly employed two factor authentication with a hardware token such as RSA SecurID such that if a password becomes compromised, two factor authentication would have required the cyberattacker to obtain a physical device in order to compromise and access the account.

102.    To prevent phishing attacks, employees should have been trained to never use their Paxton password on a website that is not a Paxton website. Defendant Paxton should have also conducted adequate phishing education training and all employee email should have been scanned and cross-checked with known phishing exploits. Emails should have been correlated to find instances of mass emails which should then be manually checked. Emails with links or attachments should have been flagged for additional security checks.

103.    To prevent the remote exploitation of Paxton's public internet facing system, Paxton's networks should have been segregated into a network with public facing servers (*e.g.*, web servers, mail servers, etc.) and a separate network with private servers (*e.g.*, databases, file systems, etc.). Servers on public facing networks should have been vigilantly scanned for vulnerabilities.

104.    Invalid internet accesses should have been logged and correlated with all other accesses from the same IP or IP subnet. Website URLs should have been scanned for signatures of attacks such as malformed requests, SQL injection and cross site scripting.

105.    To prevent a cyberattack consisting of a malware attack, Defendant Paxton should have implemented appropriate installation policies on its computer networks that prohibited the execution or installation of programs that have not been approved by Paxton's own information

technology teams.  The installation of programs that are not company-wide approved should have been denied by policy and re-evaluated on an individual basis.  In addition, Paxton should have performed daily scans of its computer networks for known malware and execution of any non-approved applications.

106.   All VPN access by Paxton employees should have originated from Paxton-issued equipment and followed appropriate security policies as described above.

107.   If there were instances where Defendant Paxton could not control the equipment or practices of third parties, third-party access should have been highly restricted and only allowed limited access to the systems needed.  Networks that have third-party access should have been treated similarly to publicly accessible networks.

108.   Regardless of the mechanism of network entry or credential acquisition, proper authorization would have minimized the cyberattack surface.  Accordingly, employees should have been segregated into groups and access to systems or specific data fields should have been restricted to only authorized groups.  Further, highly sensitive information (*e.g.*, Social Security numbers, birth dates, etc.) should have been limited using fine-grain authorization, which limits data access even further to only those who truly need such highly sensitive personal information.

109.   Had Defendant Paxton employed the above preventive measures, the Data Breach could have been prevented or curtailed.

**Detection**

110.   Defendant Paxton's detection protocols were also inadequate to protect Plaintiffs' and Class members' highly sensitive information.  Instead of immediate detection on February 26, Paxton took at least twenty-two (22) days to detect the breach. Auditing for anomalies, such as location/IP of logins, times of logins, amount of data queried per day, and types of data queries,

may have assisted in Data Breach detection.  So too would the reporting of anomalies, including report generation and review on a timely cadence.

111.    The IP, location, time, and user of all accesses should have been logged, as should the behavior of each access.  For databases, this would have included tables accessed, fields accessed (particularly sensitive fields) query text, and the amount of data returned.  These logs should have been retained on a separate system that does not share credentials of the audited system.

112.    To detect anomalies, normal behavior patterns should have been determined, and anomalous behavior such as location, time and data access anomalies should have been flagged. All anomalies were to have been aggregated into daily or weekly reports which were to be adequately reviewed.

**Paxton Employee Data Loss Prevention**

113.    The Company's data loss prevention protocols were likewise inadequate. Preventing egress of such sensitive employee data from an adequately protected environment should have been of a highest priority for Paxton.  Proper monitoring of egress from all IP ports and egress destinations and prohibiting the physical egress of data (thumb drive, unencrypted disk, and the like) of machines was similarly critical.

114.    For example, Defendant Paxton should have had policies that prevented non-Paxton computers from accessing the Paxton network.  Paxton computers should have contained encrypted hard drives that could not be used with another computer outside the Paxton network. External drives like thumb drives should not have been useable to Paxton computers.  Further, Paxton computers should not have been accessible to the internet except through the established Paxton network.

115.    Emails should have been properly routed through Defendant Paxton's internal email server, which should only have connected to external email servers through encrypted connections and all other connections should have been blocked.  All internet requests were to have been routed through Paxton's internet proxy servers.  Paxton's proxy servers were to connect to outside webservers through encrypted connections.  This would have allowed internet data to be scanned by Paxton's servers before the data is relayed.

116.    All internet accesses should have been adequately monitored and only allowed based on the destination.  Specifically, Paxton should have properly maintained a whitelist of allowable IP addresses or DNS entries, and only those destinations should have been accessible. Paxton should have also maintained a blacklist of specifically denied IP addresses or DNS entries, and any access to such destinations should be denied and Paxton's information technology teams should have followed up with the user as to why the request was made.  All addresses or entries that are not whitelisted were to be blocked, and there should have been a process by which an employee can request specific access from Paxton's cybersecurity professionals.

117.    In addition, all internet accesses were to have been adequately scanned for keywords that might suggest data loss.  Any non-text uploads were to have been denied, flagged, and reviewed, with allowable data uploads permitted on a case-by-case basis.

118.    Similar to internet access, email destinations should have been whitelisted and blacklisted with access to other recipients evaluated on a case-by-case basis.  Email domains that allowed public registration (*e.g.*, gmail.com, outlook.com, etc.) should not have been whitelisted.

119.    Had Paxton implemented these data loss prevention measures, the cyberattackers may not have been able to get the highly sensitive employee data out of the Paxton network.

120.    Defendant Paxton was aware or should have been aware of the threats of cyberattacks and the need to protect this highly sensitive current and former employee PII that they store.  The Chief Executive Officer of Paxton is a member of the Board of Directors of Computer Services, Inc. (CS), a Paducah, Kentucky-based company specializing in cybersecurity and regulation processes within the financial industry.  As a CS Board Member, he would have (or should have) been apprised of the need to adequately prepare for cybersecurity threats and best practices to prevent, identify, and contain cyberattacks such as the Data Breach.  Other data breaches occurred within close physical and temporal as the Data Breach at Paxton.  Just a year before the Data Breach, the City of Paducah was subject to a ransomware attack.  There is no doubt that data theft was and is a clear and present danger to Defendant Paxton.

121.    Paxton is required to protect Plaintiffs' and Class members' PII, and further, to handle any data breach of the same in accordance with applicable federal and state law.

122.    In addition to its obligations under federal and state law, Defendant owed a duty to Plaintiffs and Class members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.  Defendant owed a duty to Plaintiffs and Class members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the PII of the Class.

123.    Paxton owed a duty to Plaintiffs and the Class to design, maintain, and test its computer systems and networks to ensure that the PII in Defendant's possession was adequately secured and protected.

124.     Paxton owed a duty to Plaintiffs and the Class to create and implement reasonable data security practices and procedures to protect the PII in its possession.

125.     Paxton owed a duty to Plaintiffs and the Class to implement processes that would detect a breach on their data security systems in a timely manner.

126.     Paxton owed a duty to Plaintiffs and the Class to act upon data security warnings and alerts in a timely fashion.

127.     Paxton owed a duty to Plaintiffs and the Class to disclose if its computer systems and data security practices were inadequate to safeguard individuals' PII from theft because such an inadequacy would be a material fact in the decision to entrust PII with Defendant.

128.     Paxton owed a duty to Plaintiffs and the Class to disclose in a timely and accurate manner when data breaches occurred.

129.     Paxton owed a duty of care to Plaintiffs and the Class because they were foreseeable and probable victims of any inadequate data security practices.

130.     Paxton owed a duty to Plaintiffs and the Class to establish processes and procedures to protect Plaintiffs' and Class members' PII from wrongful disclosure and training employees who had access to that information as to those processes and procedures.

131.     Because Plaintiffs' and Class members' PII was ultimately disclosed, Defendant clearly breached this duty.

132.     Plaintiffs and other Class members relied on Paxton to implement and maintain systems that kept their PII safe.   Defendant had a duty to keep its employees' PII safe, particularly given the highly sensitive nature of the information stored on Defendant's computer systems. Defendant failed to comply with this duty.

**Cyber Criminals Have and Will Continue to Use Plaintiffs' and Class Members' PII for Nefarious Purposes**

133.    Plaintiffs' and Class members' highly sensitive PII is of great value to hackers and cybercriminals, and the data stolen in the Data Breach can be used in a variety of ways for criminals to exploit Plaintiffs and the Class members and to profit off their misfortune and stolen information. The cybercriminals' motives for the Data Breach were purely nefarious and malicious in nature: their one goal was to access Paxton's systems in order to obtain valuable PII to sell on the dark web.

134.    Every year, identity theft causes tens of billions of dollars of losses to victims in the United States.[14]  For example, with the PII stolen in the Data Breach, including Social Security numbers and bank account information, identity thieves can open financial accounts, apply for credit, file fraudulent tax returns, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals or undocumented immigrants, steal government benefits, give breach victims' names to police during arrests, and many other harmful forms of identity theft.[15]  These criminal activities have and will result in devastating financial and personal losses to Plaintiffs and Class members.  Indeed, Brasher has already had an SBA loan fraudulently obtained in her name.  Given the timing of the data breach and the fraudulent SBA loan, it is clear the Data Breach and the fraudulent SBA loan are causally connected.

135.    PII is such a valuable commodity to identity thieves that once it has been compromised, criminals will use it and trade the information on the cyber black-market for years.

---

[14] *Facts + Statistics: Identity Theft and Cybercrime*, Insurance Info. Inst., https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (discussing Javelin Strategy & Research's report "2018 Identity Fraud: Fraud Enters a New Era of Complexity") (last accessed on September 10, 2021).
[15] *See, e.g.*, Christine DiGangi, *5 Ways an Identity Thief Can Use Your Social Security Number*, Nov. 2, 2017, https://blog.credit.com/2017/11/5-things-anidentity-thief-can-do-with-your-social-security-number-108597/ (last accessed September 10, 2021).

136.    These risks are both certainly impending and substantial. As the FTC has reported, if hackers get access to personally identifiable information, they will use it.[16]

137.    Hackers may not use the information right away. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft.  Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years.  As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[17]

138.    For instance, with a stolen Social Security number, which is part of the PII compromised in the Data Breach, someone can open financial accounts, get medical care, file fraudulent tax returns, commit crimes, and steal benefits.[18]

139.    If cyber criminals manage to access financial information, health insurance information, and other personally sensitive data—as they did here—there is no limit to the amount of fraud to which Defendant may expose the Plaintiffs and Class members.

**Damages Sustained by Plaintiffs and Class Members**

140.    Plaintiffs and the other members of the Class have suffered injury and damages, including, but not limited to one or more of the following:

A.  unauthorized use of their PII;

---

[16] Ari Lazarus, *How fast will identity thieves use stolen info?*, FED. TRADE COMM'N (May 24, 2017), https://www.consumer.ftc.gov/blog/2017/05/how-fast-willidentity-thieves-use-stolen-info (last accessed September 10, 2021).
[17] *Stolen Laptops Lead to Important HIPAA Settlements*, U.S. Dep't of Health and Human Services (Apr. 22, 2014), available at https://wayback.archiveit.org/3926/20170127085330/https://www.hhs.gov/about/news/2014/04/22/stolenlaptops-lead-to-important-hipaa-settlements.html (last accessed September 10, 2021).
[18] *See, e.g.*, Christine DiGangi, 5 Ways an Identity Thief Can Use Your Social Security Number, Nov. 2, 2017, https://blog.credit.com/2017/11/5-things-anidentity-thief-can-do-with-your-social-security-number-108597/ (last accessed September 10, 2021).

B. damages arising from the inability to use their PII;

C. monetary costs associated with their attempts to ameliorate, mitigate and deal with the actual and future consequences of the breach, including the freezing of their credit, and enrolling in credit or identity monitoring services;

D. time spent and monetary and other costs associated with the loss of productivity or the enjoyment of one's life from taking time to address an attempt to ameliorate, mitigate and deal with the actual and future consequences of the Data Breach, and the stress, nuisance and annoyance of dealing with all issues resulting from the Data Breach (which time spent on those activities Plaintiffs and Class members could have been working and earning a living, therefore suffering further actual injury);

E. the imminent and impending injury flowing from actual and potential fraud and identity theft posed by their PII being placed in the hands of criminals;

F. damages to and diminution in value of their PII entrusted to Defendant for the sole purpose of purchasing products and services from websites operated by Defendant; and

G. the loss of Plaintiffs' and Class members' privacy.

## V.    CLASS ACTION ALLEGATIONS

141.   Plaintiffs bring all counts, as set forth below, on behalf of themselves and as a class action, pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure, on behalf of a nationwide Class defined as:

> **All natural persons residing in the United States of America whose PII was compromised in the Data Breach that occurred in February and March 2021 (the "Nationwide Class" or "Class").**

142.     In addition, Plaintiffs bring this action on behalf of themselves and on behalf of a subclass defined as:

> **All current and former employees of Defendant Paxton who are residents of the United States of America and whose PII was accessed in the Data Breach that occurred in February and March 2021 (the "Employee Subclass").**

143.     In addition, Plaintiff Bowen brings this action on behalf of himself and on behalf of a subclass defined as:

> **All current and former employees of Defendant Paxton who are residents of the Commonwealth of Virginia and whose PII was accessed in the Data Breach that occurred in February and March 2021 (the "Virginia Subclass").**

144.     In addition, Plaintiff Brasher brings this action on behalf of herself and on behalf of a subclass defined as:

> **All current and former employees of Defendant Paxton who are residents of the State of Arkansas and whose PII was accessed in the Data Breach that occurred in February and March 2021 (the "Arkansas Subclass").**

145.     In addition, Plaintiffs Rogers, Champion, and Gilstrap bring this action on behalf of themselves and on behalf of a subclass defined as:

> **All current and former employees of Defendant Paxton who are residents of the Commonwealth of Kentucky and whose PII was accessed in the Data Breach that occurred in February and March 2021 (the "Kentucky Subclass").**

146.     In addition, Plaintiff Bleier-Troup brings this action on behalf of herself and on behalf of a subclass defined as:

> **All current and former employees of Defendant Paxton who are residents of the State of California and whose PII was accessed in the Data Breach that occurred in February and March 2021 (the "California Subclass").**

147.    Excluded from the Class are Defendant and its affiliates, parents, subsidiaries, officers, and directors.  Also excluded is any judicial officer presiding over this matter and the members of their immediate families and judicial staff.

148.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

149.    **Numerosity—Federal Rule of Civil Procedure 23(a)(1).**  The members of the Class are so numerous that joinder of all Class members would be impracticable.  On information and belief, Class members number in the tens of thousands.

150.    **Commonality and Predominance—Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).**  Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Such common questions of law or fact include, *inter alia*:

> A.  Whether Defendant failed to use reasonable care and reasonable methods to secure and safeguard Plaintiffs' and Class members' PII;
>
> B.  Whether Defendant properly implemented its purported security measures to protect Plaintiffs' and Class members' PII from unauthorized capture, dissemination, and misuse;
>
> C.  Whether Defendant took reasonable measures to determine the extent of the Data Breach after it first learned of same;
>
> D.  Whether Defendant disclosed Plaintiffs' and Class members' PII in violation of the understanding that the PII was being disclosed in confidence and should be maintained;

E.  Whether Defendant failed to maintain and execute reasonable procedures designed to prevent unauthorized access to Plaintiffs' and Class members' PII;

F.  Whether Defendant was negligent in failing to properly secure and protect Plaintiffs' and Class members' PII; and

G.  Whether Plaintiffs and the other members of the Class are entitled to damages, injunctive relief, or other equitable relief, and the measure of such damages and relief.

151.    Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, on behalf of themselves and other Class members.  Similar or identical common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that predominate in this action.

152.    **Typicality—Federal Rule of Civil Procedure 23(a)(3).**  Plaintiffs' claims are typical of the claims of the other Class members because, among other things, all Class members were similarly injured through Defendant's uniform misconduct described above and were thus all subject to the Data Breach alleged herein.  Further, there are no defenses available to Defendant that are unique to Plaintiffs.

153.    **Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class members they seek to represent, they have retained counsel competent and experienced in complex class action litigation, and Plaintiffs will prosecute this action vigorously. The Class's interests will be fairly and adequately protected by Plaintiffs and their counsel.

154. **Injunctive Relief-Federal Rule of Civil Procedure 23(b)(2).** Defendant has acted and/or refused to act on grounds that apply generally to the Class, making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. Civ. P. 23(b)(2).

155. **Superiority—Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class members to individually seek redress for Defendant's wrongful conduct.  Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

## VI.   CAUSES OF ACTION

### COUNT I
**Negligence**
**(On Behalf of Plaintiffs and the Nationwide Class)**

156. Plaintiffs, individually and on behalf of the Nationwide Class, repeat and re-allege the allegations contained in paragraphs 1 through 155 as though fully set forth herein.

157. By virtue of its express undertaking to protect Class members' PII and upon accepting and storing Plaintiffs' and Class members' PII, Defendant undertook and owed a duty to Plaintiffs and Class members to exercise reasonable care to secure and safeguard that

information and to use reasonable methods to do so. Defendant knew that the PII was confidential and should be protected as private and confidential.

158.    Defendant owed a duty of care not to subject Plaintiffs' and Class members' PII to an unreasonable risk of harm because they were foreseeable and probable victims of any inadequate security practices.

159.    Defendant owed numerous duties to its current and former employees, Plaintiffs and Class members, including the following:

A.   to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting PII;

B.   to protect PII using reasonable and adequate security procedures and systems that are compliant with industry-standard practices; and

C.   to implement processes to quickly detect a data breach and to timely act on warnings about data breaches on its own systems and those of its third parties.

160.    Defendant failed to provide adequate supervision and oversight of the PII with which it was, and is, entrusted, in spite of the known risk and foreseeable likelihood of breach and misuse, which permitted a malicious third party to gather Plaintiffs' and Class members' PII, misuse the PII and intentionally disclose it to others without consent.

161.    Defendant knew, or should have known, of the risks inherent in collecting and storing PII, the vulnerabilities of its data collection and/or storage systems, and the importance of adequate security.

162.    Defendant knew, or should have known, that its data collection and/or storage systems and networks, including its third-party affiliates, did not adequately safeguard Plaintiffs' and Class members' PII.

163.    Defendant breached its duties to Plaintiffs and Class members by failing to ensure that it was providing fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class members' PII.

164.    Because Plaintiffs' and Class members' PII was exposed in the Data Breach, Defendant breached its duties to safeguard Plaintiffs' and Class members' PII.

165.    Because Defendant knew that a breach of its systems would damage an untold number of its current and former employees, including Plaintiffs and Class members, Defendant had a duty to adequately safeguard its data systems and the PII contained thereon.

166.    Defendant had a special relationship with Plaintiffs and Class members by virtue of the employment relationship.  Plaintiffs' and Class members' willingness to entrust Defendant with their PII was predicated on the understanding and conditional requirement that Defendant would take adequate security precautions.  Moreover, only Defendant had the ability to protect its systems and those of its affiliates, and the PII it stored on them, from attack.

167.    Implied in these exchanges was a promise by Defendant to ensure that the PII of Plaintiffs and Class members in its possession was only used to provide the agreed-upon compensation and other employment benefits from Defendant.

168.    As part of this special relationship, Defendant had a duty to perform with skill, care, and reasonable expedience and faithfulness with regard to providing the agreed-upon compensation and other employment benefits to Plaintiffs and Class members and protecting Plaintiffs' and Class members' PII.

169.    Plaintiffs and Class members did not receive the benefit of the bargain with Defendant, because providing their PII was in exchange for Defendant's implied agreement to secure and keep it safe.

170.    Defendant also had independent duties under state and federal laws that required it to reasonably safeguard Plaintiffs' and Class members' PII and promptly notify them about the Data Breach.

171.    Through Defendant's acts and omissions described in this Complaint, including its failure to provide adequate security and its failure to protect Plaintiffs' and Class members' PII from being foreseeably captured, accessed, disseminated, stolen and misused, Defendant unlawfully breached its duty to use reasonable care to adequately protect and secure Plaintiffs' and Class members' PII during the time it was within Defendant's possession or within its control or in the possession of its agent.

172.    The law further imposes an affirmative duty on Defendant to timely disclose the unauthorized access and theft of the PII to Plaintiffs and the Class members so that they can take appropriate measures to mitigate damages, protect against adverse consequences, and thwart future misuse of their PII.  Defendant failed to do so, only disclosing the Data Breach months after it occurred.

173.    Upon information and belief, Defendant improperly and inadequately safeguarded Plaintiffs' and Class members' PII in deviation of standard industry rules, regulations, and practices at the time of the unauthorized access.  Defendant's failure to take proper security measures to protect Plaintiffs' and Class members' sensitive PII, as described in this Complaint, created conditions conducive to a foreseeable, intentional criminal act, namely the unauthorized access of the PII.

174.    Upon information and belief, neither Plaintiffs nor the other Class members contributed to the Data Breach and subsequent misuse of their PII as described in this Complaint.

175.    As a direct and proximate cause of Defendant's conduct, Plaintiffs and Class members have suffered and will suffer damages and injury, including but not limited to:

A.  unauthorized use of their PII;

B.  theft of their PII;

C.  monetary costs associated with the detection and prevention of identity theft and unauthorized use of their PII;

D.  mental distress related to their fear of identity theft;

E.  damages arising from the inability to use their PII;

F.  time spent and monetary and other costs associated with the loss of productivity or the enjoyment of one's life from taking time to address and attempt to ameliorate, mitigate and deal with the actual and future consequences of the Data Breach, and the stress, nuisance and annoyance of dealing with all issues resulting from the Data Breach (which time spent on those activities Plaintiffs and Class members could have been working and earning a living, therefore suffering further actual injury);

G.  the imminent and impending injury flowing from their PII being placed in the hands of criminals;

H.  damages to and diminution in value of their PII entrusted to Defendant for the sole purpose of purchasing products and services from website operated by Defendant; and

I.  the loss of Plaintiffs' and Class members' privacy.

176.    As a direct and proximate cause of Defendant's negligence, Plaintiffs and Class members have suffered and will continue to suffer other forms of injury and/or harm, including,

but not limited to anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

**COUNT II**
**Breach of Implied Contract**
**(On Behalf of Plaintiffs and the Employee Subclass)**

177.    Plaintiffs, individually and on behalf of the Employee Subclass, repeat and re-allege the allegations contained in paragraphs 1 through 176 as though fully set forth herein.

178.    Defendant required Plaintiffs and the Employee Subclass to provide their personal information, including employees' names, dates of birth, Social Security numbers, driver's license numbers or state ID numbers, financial account and/or routing numbers, health insurance information, taxpayer identification numbers, and credit card numbers and/or expiration dates, as a condition of their employment.

179.    As a condition of their employment with Defendant, Plaintiffs and the Employee Subclass provided their personal and financial information. In so doing, Plaintiffs and the Employee Subclass entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiffs and the Employee Subclass if their data had been breached and compromised or stolen.

180.    Implied in these exchanges was a promise by Defendant to ensure the PII of Plaintiffs and Class members in its possession was only used to provide the agreed-upon compensation and other employment benefits from Defendant, and that Defendant would take adequate measures to protect Plaintiffs' and Class members' PII.

181.    A material term of this contract is a covenant by Defendant that it would take reasonable efforts to safeguard that information. Defendant breached this covenant by allowing Plaintiffs' and Class members' PII to be accessed in the Data Breach.

182.    Indeed, implicit in the employment agreement between Defendant and its employees was the obligation that both parties would maintain information confidentially and securely.

183.    These exchanges constituted an agreement and meeting of the minds between the parties: Plaintiffs and Class members would provide their PII in exchange for the prospect of employment and benefits provided by Defendant. These agreements were made by Plaintiffs and Class members being employed by Defendant.

184.    It is clear by these exchanges that the parties intended to enter into an agreement and mutual assent occurred. Plaintiffs and Class members would not have disclosed their PII to Defendant but for the prospect of Defendant's promise of compensation and other employment benefits. Conversely, Defendant presumably would not have taken Plaintiffs' and Class members' PII if it did not intend to provide Plaintiffs and Class members compensation and other employment benefits.

185.    Defendant was therefore required to reasonably safeguard and protect the PII of Plaintiffs and Class members from unauthorized disclosure and/or use.

186.    Plaintiffs and the Employee Subclass fully performed their obligations under the implied contracts with Defendant.

187.    Plaintiffs and Class members would not have provided and entrusted their PII to Defendant in the absence of their implied contracts with Defendant and would have instead

retained the opportunity to control their PII for uses other than compensation and other
employment benefits from Defendant.

188.    Defendant breached the implied contracts they made with Plaintiffs and the
Employee Subclass by failing to safeguard and protect their personal and financial information,
and by failing to provide timely and accurate notice to them that personal and financial information
was compromised as a result of the data breach.

189.    Defendant's failure to implement adequate measures to protect the PII of Plaintiffs
and Class members violated the purpose of the agreement between the parties: Plaintiffs'
and Class members' employment in exchange for compensation and benefits.

190.    Defendant was on notice that its systems could be vulnerable to unauthorized
access yet failed to invest in proper safeguarding of Plaintiffs' and Class members' PII.

191.    Instead of spending adequate financial resources to safeguard Plaintiffs' and Class
members' PII, which Plaintiffs and Class members were required to provide to Defendant,
Defendant instead used that money for other purposes, thereby breaching its implied contracts it
had with Plaintiffs and Class members.

192.    As a direct and proximate result of Defendant's above-described breach of
implied contract, Plaintiffs and the Employee Subclass have suffered (and will continue to suffer)
ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in
monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in
monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the
illegal sale of the compromised data on the dark web; expenses and/or time spent on credit
monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card

statements, and credit reports; expenses and/or time spent initiating fraud alerts, decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

<u>COUNT III</u>
**Invasion of Privacy**
**(On Behalf of Plaintiffs and the Employee Subclass)**

193.    Plaintiffs, individually and on behalf of the Employee Subclass, repeat and re-allege the allegations contained in paragraphs 1 through 192 as though fully set forth herein.

194.    Plaintiffs and the Employee Subclass had a legitimate expectation of privacy to their PII and were entitled to the protection of this information against disclosure to unauthorized third parties.

195.    Defendant owed a duty to its current and former employees, including Plaintiffs and the Employee Subclass, to keep their PII contained as a part thereof, confidential.

196.    Defendant failed to protect and released to unknown and unauthorized third parties the PII of Plaintiffs and the Employee Subclass.

197.    Defendant allowed unauthorized and unknown third parties access to and examination of the PII of Plaintiffs and the Employee Subclass, by way of Defendant's failure to protect the PII.

198.    The unauthorized release to, custody of, and examination by unauthorized third parties of the PII of Plaintiffs and the Employee Subclass is highly offensive to a reasonable person.

199.    The intrusion was into a place or thing, which was private and is entitled to be private.  Plaintiffs and the Employee Subclass disclosed their PII to Defendant as part of the current and former employees' employment with Defendant, but privately with an intention that the PII would be kept confidential and would be protected from unauthorized disclosure.  Plaintiffs

-43-

and the Employee Subclass were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

200.    The Data Breach at the hands of Defendant constitutes an intentional interference with Plaintiffs' and the Employee Subclass's interests in solitude or seclusion, either as to their persons or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

201.    Defendant acted with a knowing state of mind when it permitted the Data Breach to occur because it had actual knowledge that its information security practices were inadequate and insufficient.

202.    Defendant acted with reckless disregard for Plaintiffs' and Class members' privacy when it allowed improper access to its systems containing Plaintiffs' and Class members' PII.

203.    Defendant was aware of the potential of a data breach and failed to adequately safeguard its systems and implement appropriate policies to prevent the unauthorized release of Plaintiffs' and Class members' data.

204.    Because Defendant acted with this knowing state of mind, they had notice and knew the inadequate and insufficient information security practices would cause injury and harm to Plaintiffs and the Employee Subclass.

205.    As a proximate result of the above acts and omissions of Defendant, the PII of Plaintiffs and the Employee Subclass was disclosed to third parties without authorization, causing Plaintiffs and the Employee Subclass to suffer damages.

206.    Unless and until enjoined, and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Employee

Subclass in that the PII maintained by Defendant can be viewed, distributed, and used by unauthorized persons for years to come.  Plaintiffs and the Employee Subclass have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of privacy for Plaintiffs and the Employee Subclass.

<u>**COUNT IV**</u>
**Breach of Confidence**
**(On Behalf of Plaintiffs and the Employee Subclass)**

207.    Plaintiffs, individually and on behalf of the Employee Subclass, repeat and re-allege the allegations contained in paragraphs 1 through 206 as though fully set forth herein.

208.    At all times during Plaintiffs' and the Employee Subclass's interactions with Defendant, Defendant was fully aware of the confidential and sensitive nature of Plaintiffs' and the Employee Subclass's PII that Plaintiffs and the Employee Subclass—employed by Defendant—provided to Defendant.

209.    As alleged herein and above, Defendant's relationship with Plaintiffs and the Employee Subclass was governed by terms and expectations that Plaintiffs' and the Employee Subclass's PII would be collected, stored, and protected in confidence, and would not be disclosed to unauthorized third parties.

210.    Plaintiffs and the Employee Subclass employed by Defendant provided Plaintiffs' and the Employee Subclass's PII to Defendant with the explicit and implicit understandings that Defendant would protect and not permit the PII to be disseminated to any unauthorized third parties.

211.    Plaintiffs and the Employee Subclass employed by Defendant also provided Plaintiffs' and the Employee Subclass's PII to Defendant with the explicit and implicit

understandings that Defendant would take precautions to protect that PII from unauthorized disclosure.

212.    Defendant voluntarily received in confidence Plaintiffs' and the Employee Subclass's PII with the understanding that PII would not be disclosed or disseminated to the public or any unauthorized third parties.

213.    Due to Defendant's failure to prevent and avoid the Data Breach from occurring, Plaintiffs' and the Employee Subclass's PII was disclosed and misappropriated to unauthorized third parties beyond Plaintiffs' and the Employee Subclass's confidence, and without their express permission.

214.    As a direct and proximate cause of Defendant's actions and/or omissions, Plaintiffs and the Employee Subclass have suffered damages.

215.    But for Defendant's disclosure of Plaintiffs' and the Employee Subclass's PII in violation of the parties' understanding of confidence, their PII would not have been compromised, stolen, viewed, accessed, and used by unauthorized third parties.  Defendant's Data Breach was the direct and legal cause of the theft of Plaintiffs' and the Employee Subclass's PII as well as the resulting damages.

216.    The injury and harm Plaintiffs and the Employee Subclass suffered was the reasonably foreseeable result of Defendant's unauthorized disclosure of Plaintiffs' and the Employee Subclass's PII.  Defendant knew or should have known its methods of accepting and securing Plaintiffs' and the Employee Subclass's PII was inadequate as it relates to, at the very least, securing servers and other equipment containing Plaintiffs' and the Employee Subclass's PII.

217.    As a direct and proximate result of Defendant's breach of its confidence with Plaintiffs and the Employee Subclass, Plaintiffs and the Employee Subclass have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII of current and former employees; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and the Employee Subclass.

218.    As a direct and proximate result of Defendant's breaches of confidence, Plaintiffs and the Employee Subclass have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

## COUNT V
### Unjust Enrichment
### (On Behalf of Plaintiffs and the Nationwide Class)

219.    Plaintiffs, individually and on behalf of the Nationwide Class, repeat and re-allege the allegations contained in paragraphs 1 through 218 as though fully set forth herein.

220.    By engaging in the conduct described in this Complaint, Defendant has knowingly obtained benefits from Plaintiffs and the Class at Plaintiffs' and Class members' expense, namely their labor and the profits therefrom, and actual monies and other benefits under circumstances such that it would be inequitable and unjust for this Defendant to retain them.

221.    By engaging in the acts and failures to act described in this Complaint, Defendant has been knowingly enriched by the savings in costs that should have been reasonably expended to protect the PII of Plaintiffs and the Class.  Defendant knew or should have known that theft of employee PII could happen, yet it failed to take reasonable steps to pay for the level of security required to have prevented the theft of its current and former employees' PII.

222.    By engaging in the conduct described in this Complaint, Defendant has knowingly obtained benefits from Plaintiffs and the Class under circumstances such that it would be inequitable and unjust for Defendant to retain them.

223.    Defendant's failure to direct profits derived from Plaintiffs' labor toward safeguarding Plaintiffs' and Class members' PII constitutes the inequitable retention of a benefit without payment for its value.

224.    Defendant will be unjustly enriched if it is permitted to retain the benefits derived from the theft of Plaintiffs' and the Class's PII.

225.    Plaintiffs and each member of the Class are therefore entitled to an award of compensatory damages in an amount to be determined at trial, or the imposition of a constructive trust upon the monies derived by Defendant by means of the above-described actions.

## COUNT VI
### Declaratory and Injunctive Relief
### (On Behalf of Plaintiffs and the Nationwide Class)

226.    Plaintiffs, individually and on behalf of the Nationwide Class, repeat and re-allege the allegations contained in paragraphs 1 through 225 as though fully set forth herein.

227.    This count is brought under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

228.    As previously alleged, Plaintiffs and members of the Class are entered into implied contracts with Defendant, which contracts required Defendant to provide adequate security for the PII collected from Plaintiffs and the Class.

229.    Defendant owed and still owes a duty of care to Plaintiffs and Class members that require it to adequately secure Plaintiffs' and Class members' PII.

230.    Upon reason and belief, Defendant still possesses the PII of Plaintiffs and the Class members.

231.    Defendant has not satisfied its contractual obligations and legal duties to Plaintiffs and the Class members.

232.    Since the Data Breach, Defendant has not yet announced any changes to its data security infrastructure, processes or procedures to fix the vulnerabilities in its computer systems and/or security practices which permitted the Data Breach to occur and go undetected and, thereby, prevent further attacks.

233.    Defendant has not satisfied its contractual obligations and legal duties to Plaintiffs and the Class. In fact, now that Defendant's insufficient data security is known to hackers, the PII in Defendant's possession is even more vulnerable to cyberattack.

234.    Actual harm has arisen in the wake of the Data Breach regarding Defendant's contractual obligations and duties of care to provide security measures to Plaintiffs and the members of the Class. Further, Plaintiffs and the members of the Class are at risk of additional or further harm due to the exposure of their PII and Defendant's failure to address the security failings that led to such exposure.

235.    There is no reason to believe that Defendant's security measures are any more adequate now than they were before the Data Breach to meet Defendant's contractual obligations and legal duties.

236.    Plaintiffs and the Class, therefore, seek a declaration (1) that Defendant's existing security measures do not comply with its contractual obligations and duties of care to provide adequate security, and (2) that to comply with its contractual obligations and duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to:

  A.  Ordering that Defendant engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

  B.  Ordering that Defendant engage third-party security auditors and internal personnel to run automated security monitoring;

C.  Ordering that Defendant audit, test, and train its security personnel regarding any new or modified procedures;

D.  Ordering that Defendant segment employee data by, among other things, creating firewalls and access controls so that if one area of Defendant's systems is compromised, hackers cannot gain access to other portions of Defendant's systems;

E.  Ordering that Defendant purge, delete, and destroy, in a reasonably secure manner, customer data not necessary for their provisions of services;

F.  Ordering that Defendant conduct regular database scanning and security checks; and

G.  Ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

### COUNT VII
**Violation of the Virginia Consumer Protection Act**
*Va. Code Ann. §§59.1-196, et seq.*
**(On Behalf of Plaintiff Bowen and the Virginia Subclass)**

237.    Plaintiff Bowen ("Plaintiff," for purposes of this Count), individually and on behalf of the Virginia Subclass, repeats and alleges Paragraphs 1-236, as if fully alleged herein.

238.    The Virginia Consumer Protection Act prohibits "[u]sing any . . . deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction." Va. Code Ann. § 59.1-200(14).

239.    Defendant is a "person" as defined by Va. Code Ann. § 59.1-198.

240.    Defendant engaged in the complained-of conduct in connection with "consumer transactions" with regard to "services," as defined by Va. Code Ann.

§ 59.1-198. Defendant advertised, offered, or sold services relating to an individual's finding or obtaining employment. *See* Va. Code Ann. § 59.1-198.

241.    Defendant engaged in deceptive acts and practices by using deception, fraud, false pretense, false promise, and misrepresentation in connection with consumer transactions, including:

A.    Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff and Virginia Subclass members' PII, which was a direct and proximate cause of the Data Breach;

B.    Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

C.    Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and Virginia Subclass members' PII, which was a direct and proximate cause of the Data Breach;

D.    Misrepresenting that it would protect the privacy and confidentiality of Plaintiff's and Virginia Subclass members' PII, including by implementing and maintaining reasonable security measures;

E.    Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Virginia Subclass members' PII; and

F.    Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Virginia Subclass members' PII.

242.     Defendant intended to mislead Plaintiff and Virginia Subclass members and induce them to rely on its misrepresentations and omissions in order to employ Plaintiff and Virginia Subclass members.

243.     Defendant's representations and omissions, made at the time of the relevant transactions, were material because they were likely to deceive reasonable consumers, including Plaintiff and Virginia Subclass members, about the adequacy of Defendant's computer and data security.

244.     Had Defendant disclosed to Plaintiff and Virginia Subclass members that its data systems were not secure and, thus, vulnerable to attack, Defendant would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Instead, Defendant received, maintained, and compiled Plaintiff's and Virginia Subclass members' PII as part of the employment relationship between Defendant and Plaintiff and Virginia Subclass members without advising Plaintiff and Virginia Subclass members that Defendant's data security practices were insufficient to maintain the safety and confidentiality of Plaintiff's and Virginia Subclass members' PII. Accordingly, Plaintiff and the Virginia Subclass members acted reasonably in relying on Defendant's misrepresentations and omissions, the truth of which they could not have discovered.

245.     Defendant had a duty to disclose these facts due to the circumstances of this case and the sensitivity and extensivity of the PII in its possession. In addition, such a duty is implied by law due to the nature of the relationship between employees—including Plaintiff and the Virginia Subclass—and Defendant, because employees are unable to fully protect their interests with regard to their data, and placed trust and confidence in Defendant. Defendant's duty to disclose also arose from its:

A. Possession of exclusive knowledge regarding the security of the data in its systems;

B. Active concealment of the state of its security; and/or

C. Incomplete representations about the security and integrity of its computer and data systems while purposefully withholding material facts from Plaintiff and the Virginia Subclass that contradicted these representations.

246.   The above-described deceptive acts and practices also violated the following provisions of VA Code § 59.1-200(A):

A. Misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits;

B. Misrepresenting that goods or services are of a particular standard, quality, grade, style, or model; and

C. Advertising goods or services with intent not to sell them as advertised, or with intent not to sell them upon the terms advertised.

247.   Defendant acted intentionally, knowingly, and maliciously to violate Virginia's Consumer Protection Act, and recklessly disregarded Plaintiff and Virginia Subclass members' rights. Defendant was on notice that its security and privacy protections were inadequate. An award of punitive damages would serve to punish Defendant for its wrongdoing and warn or deter others from engaging in similar conduct.

248.   As a direct and proximate result of Defendant's deceptive acts or practices, Plaintiff and Virginia Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including loss of the benefit of their bargain with Defendant as they would not have sought employment from

Defendant but for Defendant's violations alleged herein; losses from fraud and identity theft; costs for credit monitoring and identity protection services; time and expenses related to monitoring their financial accounts for fraudulent activity; loss of value of their PII; and an increased, imminent risk of fraud and identity theft.

249.    Defendant's violations present a continuing risk to Plaintiff and Virginia Subclass members as well as to the general public.

250.    Plaintiff and Virginia Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages; statutory damages; restitution, injunctive relief; punitive damages; and attorneys' fees and costs.

## COUNT VIII
### Violation of the Kentucky Consumer Protection Act
### *KRS 367.110, et seq.*
### (On Behalf of Plaintiffs Champion, Gilstrap, and Rogers and the Kentucky Subclass)

251.    Plaintiffs Champion, Gilstrap, and Rogers ("Plaintiffs," for purposes of this Count), individually and on behalf of the Kentucky Subclass, repeat and allege Paragraphs 1-250, as if fully alleged herein.

252.    The Kentucky Consumer Protection Act prohibits any "unfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce." KRS 367.170.

253.    Defendant is a "person" as defined by KRS 367.110.

254.    Defendant engaged in the complained-of conduct in connection with "trade" and "commerce" with regard to "services" as defined by KRS 367.110. Defendant advertised, offered, or sold services relating to the employment of Plaintiffs and Kentucky Subclass members.

255.    Defendant engaged in deceptive acts and practices by using deception, fraud, false pretense, false promise, and misrepresentation in connection with trade and commerce, including:

A.  Failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs' and Kentucky Subclass members' PII, which was a direct and proximate cause of the Data Breach;

B.  Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

C.  Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Kentucky Subclass members' PII, which was a direct and proximate cause of the Data Breach;

D.  Misrepresenting that it would protect the privacy and confidentiality of Plaintiffs' and Kentucky Subclass members' PII, including by implementing and maintaining reasonable security measures;

E.  Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiffs' and Kentucky Subclass members' PII; and

F.  Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Kentucky Subclass members' PII.

256.    Defendant intended to mislead Plaintiffs and Kentucky Subclass members and induce them to rely on its misrepresentations and omissions in order to employ Plaintiffs and Kentucky Subclass members.

257.    Defendant's representations and omissions, made at the time of the relevant transactions, were material because they were likely to deceive reasonable consumers, including Plaintiffs and Kentucky Subclass members, about the adequacy of Defendant's computer and data security.

258.    Had Defendant disclosed to Plaintiffs and Kentucky Subclass members that its data systems were not secure and, thus, vulnerable to attack, Defendant would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Instead, Defendant received, maintained, and compiled Plaintiffs' and Kentucky Subclass members' PII as part of the employment relationship between Defendant and Plaintiffs and Kentucky Subclass members without advising Plaintiffs and Kentucky Subclass members that Defendant's data security practices were insufficient to maintain the safety and confidentiality of Plaintiffs' and Kentucky Subclass members' PII. Accordingly, Plaintiffs and the Kentucky Subclass members acted reasonably in relying on Defendant's misrepresentations and omissions, the truth of which they could not have discovered.

259.    Defendant had a duty to disclose these facts due to the circumstances of this case and the sensitivity and extensivity of the PII in its possession. In addition, such a duty is implied by law due to the nature of the relationship between employees—including Plaintiffs and the Kentucky Subclass—and Defendant, because employees are unable to fully protect their interests with regard to their data, and placed trust and confidence in Defendant. Defendant's duty to disclose also arose from its:

   A.    Possession of exclusive knowledge regarding the security of the data in its systems;

   B.    Active concealment of the state of its security; and/or

      C.   Incomplete representations about the security and integrity of its computer and data systems while purposefully withholding material facts from Plaintiffs and the Kentucky Subclass that contradicted these representations.

260.    Defendant acted intentionally, knowingly, and maliciously to violate Kentucky's Consumer Protection Act, and recklessly disregarded Plaintiffs and Kentucky Subclass members' rights. Defendant was on notice that its security and privacy protections were inadequate. An award of punitive damages would serve to punish Defendant for its wrongdoing and warn or deter others from engaging in similar conduct.

261.    As a direct and proximate result of Defendant's deceptive acts or practices, Plaintiffs and Kentucky Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including loss of the benefit of their bargain with Defendant as they would not have sought employment from Defendant but for Defendant's violations alleged herein; losses from fraud and identity theft; costs for credit monitoring and identity protection services; time and expenses related to monitoring their financial accounts for fraudulent activity; loss of value of their PII; and an increased, imminent risk of fraud and identity theft.

262.    Defendant's violations present a continuing risk to Plaintiffs and Kentucky Subclass members as well as to the general public.

263.    Plaintiffs and Kentucky Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages, restitution, injunctive relief, punitive damages, and attorneys' fees and costs.

<u>COUNT IX</u>
**Violations of the California Unfair Competition Law**
*Cal. Bus. & Prof. Code §§17200, et seq. ("UCL")*
**(On Behalf of Plaintiff Bleier-Troup and the California Subclass)**

264.    Plaintiff Bleier-Troup ("Plaintiff" for purposes of this Count), individually and on behalf of the California Subclass, repeats and alleges Paragraphs 1-263, as if fully alleged herein.

265.    By reason of the conduct alleged herein, Defendant engaged in unlawful and unfair business practices within the meaning of California's Unfair Competition Law ("UCL"), Business and Professions Code § 17200, *et seq*.

266.    Defendant required Plaintiff and California Subclass members to provide their PII to Defendant, including names, dates of birth, Social Security numbers, and other personal information.

267.    Implied in these exchanges was a promise by Defendant to ensure that the PII of Plaintiff and California Subclass members in its possession was only used to provide the agreed-upon compensation and other employment benefits from Defendant.

268.    Plaintiff and California Subclass members therefore did not receive the benefit of the bargain with Defendant, because providing their PII was in exchange for Defendant's implied agreement to secure and keep it safe.

269.    Defendant stored the PII of Plaintiff and all California Subclass members in its computer systems. Defendant falsely represented to Plaintiff and all California Subclass members that their PII was secure and would remain private or, alternatively, failed to disclose to Plaintiff and the California Subclass that their PII was not secure.

270.    Defendant knew or should have known it did not employ reasonable, industry standard, and appropriate security measures that complied with federal regulations and that would have kept Plaintiff's and all California Subclass members' PII secure and prevented the loss or

misuse of that PII.

271.    Even without these misrepresentations and omissions, Plaintiff and all California Subclass members were entitled to assume, and did assume, that Defendant would take appropriate measures to keep their PII safe. Defendant did not disclose at any time that Plaintiff's and all California Subclass members' PII was vulnerable to hackers because Defendant's data security measures were inadequate and outdated, and Defendant was the only one in possession of that material information, which it had a duty to disclose.

**Unlawful Business Practices**

272.    Defendant violated Section 5(a) of the FTC Act (which is a predicate legal violation for this UCL claim) by misrepresenting the safety of its computer systems, specifically the security thereof and whether the systems were properly up-to-date or encrypted, and its ability to safely store Plaintiff's and all California Subclass members' PII.

273.    Defendant also violated Section 5(a) of the FTC Act by failing to implement reasonable and appropriate security measures or follow industry standards for data security, including with regard to encryption, and by failing to timely notify Plaintiff and all California Subclass members of the Data Breach.

274.    Defendant also violated California Civil Code § 1798.81.5(b) in that it failed to maintain reasonable security procedures and practices, including with regard to encryption.

275.    If Defendant had complied with these legal requirements, Plaintiff and all California Subclass members would not have suffered the damages related to the Data Breach, and from Defendant's failure to timely notify Plaintiff and all California Subclass members of the Data Breach.

276.    Defendant's acts, omissions, and misrepresentations as alleged herein were

unlawful and in violation of, inter alia, Section 5(a) of the FTC Act.

277.    Plaintiff and all California Subclass members suffered injury in fact and lost money or property as the result of Defendant's unlawful business practices. In addition, Plaintiff and all California Subclass members' PII was taken and is in the hands of those who will use it for their own advantage, or is being sold for value, making it clear that the hacked information is of tangible value. Plaintiff and all California Subclass members have also suffered consequential out of pocket losses for procuring credit freeze or protection services, identity theft monitoring, password protection, and other expenses relating to identity theft losses or protective measures. Further, because of Defendant's actions and inactions, Plaintiff and California Subclass members will need to enroll in credit monitoring and identity protection for the rest of their lives.

278.    Plaintiff's and California Subclass members' PII is highly valuable to them given its novel and confidential nature, the difficulty (or impossibility) of changing it, and that the possession of it affords the PII holder authority to enter into various financial transactions (e.g. credit cards, loans, large purchases, etc.).

**Unfair Business Practices**

279.    Defendant engaged in unfair business practices under the "balancing test." The harm caused by Defendant's actions and omissions, as described in detail above, which included failure to implement proper safeguards and/or failure to encrypt its systems, greatly outweigh any perceived utility. Indeed, Defendant's failure to follow basic data security protocols and misrepresentations to current and former employees about Defendant's data security cannot be said to have had any utility at all. All of these actions and omissions were clearly immoral, unethical, oppressive, unscrupulous, and substantially injurious to Plaintiff and all California

Subclass members, directly causing the harms alleged below.

280.    Defendant also engaged in unfair business practices under the "tethering test." Defendant's actions and omissions, as described in detail above, violated fundamental public policies expressed by the California Legislature. *See, e.g.*, Cal. Civ. Code § 1798.1 ("The Legislature declares that . . . all individuals have a right of privacy in information pertaining to them . . . . The increasing use of computers . . . has greatly magnified the potential risk to individual privacy that can occur from the maintenance of personal information."); Cal. Civ. Code § 1798.81.5(a) ("It is the intent of the Legislature to ensure that personal information about California residents is protected."); Cal. Bus. & Prof. Code § 22578 ("It is the intent of the Legislature that this chapter [including the Online Privacy Protection Act] is a matter of statewide concern."). Defendant's acts and omissions thus amount to a violation of public policy tethered to specific statutory and constitutional provisions.

281.    Defendant engaged in unfair business practices under the "FTC test." The harm caused by Defendant's actions and omissions, as described in detail above, is substantial in that it affects many California Subclass members and has caused those persons to suffer actual harms. Such harms include a substantial risk of identity theft, disclosure of Plaintiff's' and all California Subclass members' PII to third parties without their consent, potential sale of Plaintiff's PII on the dark web, consequential out of pocket losses for procuring credit freeze or protection services, identity theft monitoring, password protection, and other expenses relating to identity theft losses or protective measures. This harm continues given the fact that Plaintiff's and all California Subclass members' PII remains in Defendant's possession, without adequate protection, and is also in the hands of those who obtained it without their consent. Defendant's actions and omissions violated Section 5(a) of the Federal Trade Commission Act. See 15 U.S.C. § 45(n) (defining

-62-

"unfair acts or practices" as those that "cause[ ] or [are] likely to cause substantial injury to consumers which [are] not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition"); see also, e.g., *In re LabMD, Inc.*, FTC Docket No. 9357, FTC File No. 102-3099 (July 28, 2016) (failure to employ reasonable and appropriate measures to secure personal information collected violated § 5(a) of FTC Act).

282.    The Data Breach is not outweighed by any countervailing benefits to consumers or competition – there is no benefit to Plaintiff and California Subclass members of having their PII accessed by unauthorized parties and eventually sold on the dark web.

283.    Plaintiff and California Subclass Members could not have reasonably avoided the substantial injury caused by Defendant's misconduct. They were required to provide their PII to Defendant in exchange for compensation and employment benefits, or to be considered for employment by Defendant.

284.    Plaintiff and all California Subclass members suffered injury in fact and lost money or property as the result of Defendant's unfair business practices. Plaintiff and all California Subclass members' PII was taken and is in the hands of those who will use it for their own advantage, and could be sold for value, making it clear that the hacked information is of tangible value. Plaintiff and all California Subclass members have also suffered consequential out of pocket losses for procuring credit freeze or protection services, identity theft monitoring, and other expenses relating to identity theft losses or protective measures. Defendant gained money that it should have instead spent on implementing proper safeguards and monitoring for Plaintiff's and California Subclass members' PII.

285.    As a result of Defendant's unlawful and unfair business practices in violation of the UCL, Plaintiff and all California Subclass members are entitled to damages, injunctive relief, and

reasonable attorneys' fees and costs.

## VII.    DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all claims so triable.

## VIII.    REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other members of the Class proposed in this Complaint, respectfully request the Court enter judgment in their and the Class's favor and against Defendant, as follows:

A.  Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiffs as Class Representatives, and appointing Class Counsel as requested in Plaintiffs' expected motion for class certification;

B.  Ordering Defendant to pay actual/statutory damages as appropriate to Plaintiffs and the other members of the Class;

C.  Ordering Defendant to pay punitive damages, as allowable by law, to Plaintiffs and the other members of the Class;

D.  Ordering Defendant to pay attorneys' fees and litigation costs to Plaintiffs and their counsel;

E.  Ordering Defendant to pay equitable relief, in the form of disgorgement and restitution, and injunctive relief as may be appropriate;

F.  Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded; and

G.  Ordering such other and further relief as may be just and proper.

Date:   January 12, 2022                                    Respectfully submitted,

*/s/William B. Federman*
William B. Federman*
FEDERMAN & SHERWOOD
10205 N. Pennsylvania Avenue
Oklahoma City, OK 73120
Telephone: (405) 235-1560
Facsimile: (405) 239-2112
Email: Wbf@federmanlaw.com

Lori G. Feldman*
GEORGE GESTEN MCDONALD, PLLC
102 Half Moon Bay Drive
Croton-on-Hudson, New York 10520
Phone: (917) 983-9321
Fax: (888) 421-4173
Email: LFeldman@4-Justice.com
E-Service: eService@4-Justice.com

David J. George*
Brittany L. Brown*
GEORGE GESTEN MCDONALD, PLLC
9897 Lake Worth Road, Suite
#302 Lake Worth, FL 33467
Phone: (561) 232-6002
Fax: (888) 421-4173
Email: DGeorge@4-Justice.com
          BBrown@4-Justice.com
E-Service: eService@4-Justice.com

Jeffery A. Roberts (KBA Bar # 84344)
ROBERTS LAW OFFICE
509 Main Street
Murray, Ky. 42071
Phone: 270-753-0053
Email: jeff@jeffrobertslaw.com

***Attorneys for Plaintiffs and the Putative Classes***

*Admitted *pro hac vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 12, 2022 a copy of the foregoing was filed electronically. Service of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

<u>*/s/William B. Federman*</u>
William B. Federman
